PUBLIC SERVICE ELECTRIC AND GAS COMPANY, A NEW JER-
SEY CORPORATION, PETITIONER-APPELLANT, v. JOSEPH
H. RODRIGUEZ, THE PUBLIC ADVOCATE OF THE STATE OF
NEW JERSEY, RESPONDENT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 2, 1984—Decided August 7, 1984.

Before Judges FRITZ, FURMAN and DEIGHAN.

*R. Edwin Selover* argued the cause for appellant (*R. Edwin Selover* and *Richard Fryling, Jr.,* attorneys).

*Susan Claire Remis,* of the Bar of the District of Columbia, admitted pro hac vice, argued the cause for respondent (*Joseph H. Rodriguez,* Public Advocate of the State of New Jersey, attorney; *R. William Potter,* Assistant Public Advocate, *Richard E. Shapiro,* Director, Division of Public Interest Advocacy, and *Susan Claire Remis,* on the brief).

The opinion of the court was delivered by

FRITZ, P.J.A.D.

The sole question involved in this appeal is whether the Public Advocate is statutorily authorized to intervene in a federal regulatory matter. Public Service Electric and Gas Company (PSE & G) insists he may not and seeks relief here, citing jurisdiction in *R.* 2:2–3(a)(2) "in that the Public Advocate's decision to intervene in the [Nuclear Regulatory Commission] proceeding is a final decision of a state administrative agency or officer." We are satisfied that the challenge lacks merit.

The particular factual circumstances of the matter are not significant. On publication of a notice in the Federal Register stating that the Nuclear Regulatory Commission (NRC) would consider an application of PSE & G and Atlantic City Electric

Company (ACE) for a facility operating license for the Hope Creek Generating Station, the Department of the Public Advocate filed a motion with the NRC for admission as a party-intervenor and for a public hearing. It was that "final decision" which prompted PSE & G, on its own behalf and that of ACE, to bring this appeal.[1]

Both parties attack the statute with studied rigidity, zeroing in on the particular sections which support their respective positions.

For instance, PSE & G insists that the Public Advocate may only act through one of the divisions in the department, *N.J. S.A.* 52:27E–4h, pointing out that a deputy assigned to the Division of Rate Counsel signed the motion, and argues further that the Division of Rate Counsel is limited by *N.J.S.A.* 52:27E–18 to State (as contrasted with Federal) proceedings only. The Public Advocate responds that he may integrate functions within the department, *N.J.S.A.* 52:27E–4j, in order to organize and coordinate the work of the department, *N.J.S.A.* 52:27E–4i, toward the end of accomplishing his responsibility to "best serve the public interest," *N.J.S.A.* 52:27E–29, as that interest is defined in *N.J.S.A.* 52:27E–30 and entrusted to his sole and broad discretion by *N.J.S.A.* 52:27E–31. PSE & G counters with the assertion that if the principal responsibility lies with the Division of Public Interest Advocacy, its jurisdiction is limited to State matters by the plain language of *N.J.S.A.* 52:27E–32, at least as far as intervention in an administrative matter is concerned.

---

[1] In granting the motion, the NRC found that the petition of the Public Advocate "adequately pleads the interest, status and authority of the Public Advocate in representing the State of New Jersey," but added:

> ... If the Applicants desire to challenge seriously the status of the Public Advocate under the New Jersey statutes and regulations, they may do so in the appropriate State courts. We do not deem it either necessary or desirable to convert this proceeding into a judicial forum to interpret New Jersey statutes relating to the legal status and authority of the Public Advocate.

■ These positions point up the fact that the statute itself, while clear enough in the isolated sections, contains conflicts. Our duty in such case is to resolve those conflicts by ascertaining the intent of the Legislature as derived from the Act as a whole. In *Clifton v. Zweir,* 36 *N.J.* 309, 323 (1962) Justice Hall described our task and the way to accomplish it by seeking "the sense of the situation." He cautioned:

> Judicial resolution of such matters must be guided by only one principle: legislative intent. The recent language of this court in *State v. Provenzano,* 34 *N.J.* 318, 322 (1961), although describing the construction of a single statute, is pertinent here: "The goal of the interpretative process is the intent of the Legislature ˇ ˣ ˣ All rules of construction are subordinate to that obvious proposition." *Turon v. J. & L. Construction Co.,* 8 *N.J.* 543, 557 (1952) uses this language: "The reconciliation of apparently conflicting statutes, judged by the letter alone, to conform to the spirit of the legislation as a whole is a common exercise of the judicial interpretative function." Since ascertainment of intent is necessarily a matter of reconstruction and has elements of fiction in it, a court's realistic approach should be, as a learned contemporary scholar phrases it, to try "to make sense out of the legislation, so far as text and context may allow." *Llewellyn, The Common Law Tradition: Deciding Appeals* 529 (1960).
>
> We cannot solve problems of this kind merely by mechanically selecting and applying a canon or maxim of statutory construction and mouthing it as the reason for the result reached. While they represent "an accepted conventional vocabulary," which lawyers and judges traditionally utilize in argument and opinion, speaking in "a diplomatic tongue," there are, as Llewellyn emphasizes, two opposing canons on almost every point and "to make any canon take hold in a particular instance, the construction contended for must be sold, essentially, by means other than the use of the canon ˙ � ˙." *Id.* 374–375, 521. [At 322–323.]

■ While legislative delegation has far outrun the confines of *Panama Refining Co. v. Ryan,* 293 *U.S.* 388, 55 *S.Ct.* 241, 79 *L.Ed.* 446 (1935) and *A.L.A. Schechter Poultry Corp. v. United States,* 295 *U.S.* 495, 55 *S.Ct.* 837, 79 *L.Ed.* 1570 (1935) whose doctrines we long ago said were "apt to wither on the vine as authorities inimical to delegative flexibility," *Esso Standard Oil Co. v. Holderman,* 75 *N.J.Super.* 455, 474 (App.Div. 1962), aff'd o.b. 39 *N.J.* 355 (1963), app. dism. *sub nom. Humble Oil & Refining Co. v. Male,* 375 *U.S.* 43, 84 *S.Ct.* 148, 11 *L.Ed.* 2d 107 (1963), we recognize, as PSE & G urges, that "[a]dministrative discretion is special and limited, contained by the de-

clared legislative policy to be executed by the agency and the specific means provided by the lawmaker to that end.... [W]here there is reasonable doubt of the existence of a particular power, the power is denied," *Swede v. City of Clifton,* 22 *N.J.* 303, 312 (1956).

On the other hand, *Swede* also teaches that "[t]he legislative grant is inclusive of such authority as is by fair implication and intendment incident to the agency's essential function and purpose ...." *Ibid.* We are satisfied that the Act read as a whole clearly demonstrates "by fair implication and intendment incident to the agency's essential function and purpose" an investment of the authority the Public Advocate here seeks to exercise. We believe the limitations of such sections as *N.J. S.A.* 52:27E–32, emphasized by PSE & G, and *N.J.S.A.* 52:27E–18 are more apparent than real: a delegation of more obvious but not necessarily exclusive authority as a first attempt by legislators fashioning an entirely new concept in public protection. This view is buttressed by the broad language defining the "public interest" in *N.J.S.A.* 52:27E–30 in terms of the "laws of the United States or of this State," and in *N.J.S.A.* 52:27E–31 leaving the "sole discretion" of the Public Advocate untrammeled with respect to "representing the public interest in any proceeding." He is even permitted to choose up sides and only represent one side in cases of inconsistent public interests, leaving the other side not publicly represented if he thinks this best. *Ibid.*

Considerations such as these are unquestionably what caused Justice Clifford to remark upon the several times that challenges "to the breadth of the Public Advocate's discretionary power" had been rejected by our courts and then, after considering the legislative history (as we have), again to reject such a challenge. *Mt. Laurel Tp. v. Public Advocate of N.J.,* 83 *N.J.* 522, 533–534 (1980). He characterized the New Jersey view of the "very broad" powers of the Public Advocate, as a "broadly-defined grant of power" employed by another state and attributed the concept to the fact that "such breadth was

necessary to effectuate the purposes of the act." 83 *N.J.* at 534.

Primary regard is to be given to the fundamental purpose for which the legislation was enacted. *N.J. Builders, Owners and Managers Association v. Blair,* 60 *N.J.* 330, 338 (1972). First attention must go to the purpose of the legislation even as against a literal reading. *Continental Cas. Co. v. Knuckles,* 142 *N.J.Super.* 162 (App.Div.1976). In view of some of the apparent conflicts, here we hearken to the venerable wisdom of Judge Cardozo, who taught in *People v. Knapp,* 230 *N.Y.* 48, 63, 129 *N.E.* 202, 208 (Ct.App.1920), cert. den. *sub nom. State Tax Comm'r v. New York ex rel. Alpha Portland Cement Co.,* 256 *U.S.* 702, 41 *S.Ct.* 624, 65 *L.Ed.* 1179 (1921):

> ... When all the world can see what sensible legislators in such a contingency would wish that we should do, we are not to close our eyes as judges to what we must perceive as men. This need is all the greater in fields where the law is in a stage of transition and readjustment.

We do no more than that here, and no less. Clearly this is justified by the very apparent public interest in nuclear energy matters which deserves representation.

The Public Advocate has the authority he asserts. The appeal is dismissed. No costs.