**IDEAL TOY CORPORATION, Plaintiff,**

v.

**ADANTA NOVELTIES CORP., Ella Singer and Gustav Dreyfus, Defendants.**

United States District Court
S. D. New York.
Nov. 22, 1963.

Amster & Levy, New York City, for plaintiff.

H. Jordan Lee, New York City, for defendants; Michael F. Mayer, New York City, of counsel.

WYATT, District Judge.

This is an application for a preliminary injunction in an action for infringement of copyright (17 U.S.C. § 101) and for unfair competition. Jurisdiction of both claims appears from 28 U.S.C. § 1338(a) and (b).

The competing articles are dolls, in respect of which the most recent learning seems to be in Ideal Toy Corp. v. Sayco Doll Corp., 302 F.2d 623 (2d Cir. 1962).

The same plaintiff ("Ideal") is plaintiff in the case at bar. It has been making and selling dolls for over 50 years.

In March 1962, plaintiff offered for sale and thus "published" a new 12 inch doll (girl) to which it affixed notice of copyright on the shoulder blades and just below the hairline on the neck at back.

The claim to copyright was registered much later in two classes. The Register of Copyrights issued two certificates of registration. One was in the class "[w]orks of art; models or designs for works of art" (17 U.S.C. § 5(g)); apparently this was the doll itself, with hair and without clothing. The other was in the class "[p]rints and pictorial illustrations including prints or labels used for articles of merchandise" (17 U.S.C. § 5(k)); what was claimed and deposited in this class cannot be determined from the material submitted. As to each certificate the date of publication was given as March 1, 1962; the date of receipt of application and copies was shown as April 15, 1963; the "title" in each certificate was given as "Tammy".

Beyond question the "Tammy" doll as merchandised by plaintiff was an outstanding success. It became widely and favorably known. It represents a "teen age" girl and has always been sold dressed in a "basic outfit", which is a distinctive blue, white trimmed, short sleeved, turtle neck playsuit with white tennis shoes; the playsuit has shorts instead of a skirt. The Tammy doll so dressed has been sold in a rectangular box, with illustrations, name, and descriptive or advertising material on the box. The most prominent color is light purple on which appears two scroll borders of a running wavy black or blue line.

Plaintiff has also offered separately a variety of other clothes and accessories for use with the Tammy doll. Plaintiff

has also created a family of dolls for Tammy—brothers, sisters, mother and father. Plaintiff devotes a separate catalog exclusively to "Tammy and her family of dolls".

It appears without contradiction that in 1962 Ideal spent over $200,000 in advertising and promoting the Tammy doll; we are told that in 1963 such spending will be above $1,250,000. Television has been used extensively; advertising has been in trade magazines and elsewhere; other promotional material has been employed.

In 1962, more than 500,000 Tammy dolls were sold, in dollar volume above $1,500,000. In eight months of 1963, more than 1,250,000 Tammy dolls were sold, in dollar volume above $3,750,000. Plaintiff has published a newsletter called "Tammy Topics" for children who are present or potential purchasers. There has been much correspondence with children and their mothers about "Tammy".

Plaintiff shows a reasonable probability that it can establish at trial not only that the Tammy doll has become widely and favorably known but that it has become identified with, and as made by, the plaintiff.

Defendant Adanta Novelties Corp. ("Adanta") is said to be controlled by the individual defendants but they need not be referred to herein. Adanta is sometimes here called "defendant".

Defendant is making and selling a doll of the same sort as Tammy but in a cheaper price range. When plaintiff learned of the dolls of defendant does not appear. It is also not clear when defendant first began making its dolls. The affidavit of Singer for Adanta states that "it was in the early months of 1962". Theoretically this could be either before or after the "publication" of Tammy on March 1, 1962. There is no way to establish from this record—except so far as may be done by comparison of the dolls themselves—whether the doll of Adanta was created from the example of the Tammy doll. A comparison of the dolls as dressed leads to the conclusion that defendant began making its dolls after the Tammy doll was on the market and with knowledge of the Tammy doll.

The doll of Adanta has no name. It is sold as part of a "Mix and Match Set" in a large square box, the top being of a clear material so that the contents can be plainly seen. The bottom of the box (seen through the clear material), the sides of the box and the lettering are all in a light purple color which, while not of exactly the same shade as that of the Tammy boxes, is so close as to seem the same at a quick glance. The similarity of the colors, considering the wide range available to defendant, leads to the strong suspicion of deliberate imitation. This is reinforced by the fact that defendant superimposes on the light purple background a line with scroll effect which resembles the running wavy line in the light purple background on the Tammy box.

The defendant's doll is roughly the same size as Tammy and is sold in exactly the same "basic outfit" playsuit as plaintiff uses in selling Tammy and with the same white tennis shoes. While some of the doll suits of defendant are of a different color from that of Tammy, many of the dolls are sold by defendant with a playsuit of exactly the same color as Tammy's.

The "Mix and Match set" as sold by defendant contains not only the doll dressed in a playsuit but also other items of clothing and accessories so displayed as to be seen through the clear top. Unlike Tammy whose hair is permanently fixed to her head, the dolls of defendant have no hair and are sold with three detachable wigs; some of the wigs of defendant are of the same color as the hair of Tammy. When its Mix and Match Sets leave defendant, apparently one of the wigs is on the doll; the combination could be the same blue playsuit and hair as are found on Tammy.

So far as the action is based on copyright infringement, the comparison to determine similarity must be between the Tammy doll unclothed (marked defendant's exhibit "5" at argument) and the Adanta doll unclothed (marked de-

fendant's exhibit "4" at argument). The copyright of defendant extends only so far, judging from the description "doll" in the claim as registered.

There is no evidence from which similarity or copying can be determined except the dolls themselves. The affidavits of plaintiff point to no copied features but contain mere conclusions, such as "blatant copying", "outright copying" and "piratical copy".

There is no contradiction of the assertion for defendant that both dolls are in "an ordinary and common doll size utilized by many companies * * * for many years".

Looking at the Tammy doll and the Adanta doll, similarities and differences can be seen. The nose, bow mouth, pink on cheeks, eye brows, shape of eyes, eyelashes at side seem similar. On the other hand, Tammy has hair while Adanta has none; the necks differ; the flesh color is different; breast development is different.

Considering the total effect and remembering that features of the human body are involved, it is not possible to reach an assured conclusion that there is such a similarity as would justify the issuance of a preliminary injunction on the basis of infringement. The doubts are strongly confirmed when the doll is examined which is made by American Doll and Character Company; this doll was offered in evidence by defendant (marked defendant's exhibit "6" at argument). This doll seems much closer to Tammy than does the doll of Adanta. In this connection, see Judge Clark's dissent in Ideal Toy Corp. v. Sayco Doll Corp., above (302 F.2d at pages 627, 628).

So far as the action is based on unfair competition, the situation seems to be different.

When defendant offers its doll with a playsuit exactly the same in design as used by plaintiff (with the same white tennis shoes) and especially when the playsuit is the same blue color as Tammy's, there is not only a misappropriation of the business ideas of plaintiff; present also is the likelihood of confusion created by defendant, meaning that purchasers of the dolls of defendant "would believe that they came from the same source" as the Tammy doll. Chas. D. Briddell, Inc. v. Alglobe Trading Corp., 194 F.2d 416, 419 (2d Cir. 1952).

Whether the misappropriation of plaintiff's business ideas would alone support a cause of action for unfair competition is doubtful. The use by defendant of the light purple color on its packages and of scroll effect lines, while imitative, seems permissible. There is no evidence of deliberate encouragement to substitute the product of defendant for that of plaintiff, as was seen in Upjohn Co. v. Schwartz, 246 F.2d 254 (2d Cir. 1957). There is no evidence that defendant "has indulged in one of the proscribed practices which equity will enjoin", the second category of Judge Moore in Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569, 571 (2d Cir. 1959).

The situation here does seem, however, to fit into the first category of Judge Moore in the Norwich Pharmacal case, namely, "secondary meaning plus likelihood of confusion" (271 F.2d at 571).

Plaintiff appears to show a reasonable probability of success on the issue of "secondary meaning" as applied to its doll dressed in the "basic outfit" playsuit trimmed in white.

The number of such dolls sold, the amount spent in advertising, the promotion of Tammy as a figure for children, the far spreading acceptance of the doll and her family—all point strongly to an identification of the Tammy doll with a single source, the plaintiff.

The likelihood of confusion seems apparent from the similar appearance of the dolls with hair and when dressed in the white trimmed playsuit. This is made more likely because the doll of defendant has no name and therefore could be more easily substituted for Tammy than would be the case if it were named, for example,

"Barbara" or any other name differing from Tammy. Doubtless also the prospective customers, children, are more easily confused than a more sophisticated buying public.

If it were assumed that plaintiff has no reasonable probability of success as to secondary meaning, even so plaintiff would seem entitled to a preliminary injunction because of "palming off". This seems to follow from the following language of Judge Kaufman in Hygienic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614, 620 (2d Cir. 1962):

> "The absence of secondary meaning does not always preclude recovery on a claim for unfair competition, because competition must be 'fair' to the trade as well as to the consumer. Thus, the law recognizes a right of relief against certain practices having destructive effect primarily on a producer's competitive position, to wit, actual deception of purchasers, palming off, and appropriation of property rights."

To establish "palming off" it does not appear necessary to show efforts by defendant to cause substitution, such as were present in Upjohn Co. v. Schwartz, above, or other actual deception. Judge Kaufman in the quoted passage distinguishes between "actual deception of purchasers" on the one hand and "palming off" on the other. He later quotes from an English decision that a seller is not allowed to use names, marks, etc. or "other indicia, by which he may induce purchasers to believe, that the goods which he is selling are the manufacture of another person" (302 F.2d at 620–621). In other words, the "fraud" is found in the mere similarities of the "indicia", without more.

█ Accordingly the motion is granted to the extent indicated, namely, with respect to the sale by defendants of its dolls dressed in the white trimmed playsuit similar to that used by plaintiff on its Tammy dolls when sold; the motion is otherwise denied.

The findings of fact and conclusions of law are contained herein. Fed.R.Civ.P. 52(a).

Settle order on notice, observing the requirements of Fed.R.Civ.P. 65(d) and suggesting the amount of security to be given under Fed.R.Civ.P. 65(c).