**BLAZON, INC., Plaintiff,**

v.

**DeLUXE GAME CORP., Defendant.**

**No. 65 Civ. 697.**

United States District Court
S. D. New York.
May 11, 1965.

Davis, Hoxie, Faithfull & Hapgood, New York City, Ely, Goldrick & Flynn, Cleveland, Ohio, Albert L. Ely, Jr., Cleveland, Ohio, of counsel, for plaintiff.

Arnold Fein, New York City, for defendant.

### MEMORANDUM—OPINION

TENNEY, District Judge.

Plaintiff moves herein for a preliminary injunction to restrain defendant, from further infringing plaintiff's copyrighted work. The complaint as drawn avers a cause of action for copyright infringement and for unfair competition. The alleged infringing item is defendant's hobby horse named "Thunder" which plaintiff asserts infringes upon its

copyrighted hobby horse "War Cloud". Jurisdiction of this Court is invoked under Section 1338(a) and (b) of Title 28 of the United States Code (28 U.S.C. § 1338(a), (b) (1962).

Plaintiff's complaint is predicated on the assumption that the horse displayed in defendant's showroom and seized pursuant to a writ of seizure dated March 8, 1965, is the alleged infringing item. It is clear, however, that the seized and displayed item is in fact plaintiff's own horse, admittedly bought by defendant and displayed by it in its showroom.

It is further not disputed that defendant repainted plaintiff's item and in the process painted over the copyright notice, and, in addition, it appears that plaintiff's trademark was replaced with its own. While that much is not disputed, there is much dispute as to the reasons for defendant's actions, the use to which the item was put, and statements made by defendant's salesmen with respect to the item.

Insofar as the horse seized and displayed is concerned, it is clear that plaintiff cannot, based on that use of the item, ground an action for copyright infringement.

 It is clear that before there can be infringement there must be both an averment and some proof of copying (Affiliated Enterprises, Inc. v. Gruber, 86 F. 2d 958 (1st Cir. 1936); see Nimmer, Copyright § 137.1 (1963)), and as a matter of logic there can be no copying in the case at bar where the horse seized and alleged to copy "War Cloud" is *in fact* "War Cloud", nor is there an infringement upon any of plaintiff's other protected rights by reason of the display of the copyrighted work. For a full discussion of possible rights protected, see Appendix "A", hereto.

 Furthermore, if it can be held that the display of "War Cloud" by defendant constituted a copying of "War Cloud" and/or a violation of any other rights, and therefore an infringement of the copyright, there is no showing of any harm, much less irreparable harm, by

denying the motion for the injunction. While it cannot be doubted that after a prima facie showing is made by plaintiff of copyright validity and infringement, plaintiff need not make a detailed showing of danger of irreparable harm (Rushton Co. v. Vitale, 218 F.2d 434 (2d Cir. 1955)), nonetheless, as Professor Nimmer points out, "[t]he Court may nevertheless deny a preliminary injunction if the plaintiff's damages appear to be trivial [Consumers Union of United States, Inc. v. Hobart Mfg. Co., 189 F. Supp. 275 (S.D.N.Y.1960)] * * * or possibly if the plaintiff fails to indicate a sufficient likelihood of immediate irreparable injury to satisfy the granting of such relief. [See Platt & Munk Co. Inc. v. Republic Graphics, Inc., 218 F. Supp. 262 (S.D.N.Y.1962), modified, 315 F.2d 847 (2d Cir. 1963)]". Nimmer, supra, § 157.2 at 698. In the case at bar the model of "War Cloud" that was displayed has been seized, and accordingly there can be no further infringement by its continued display. In addition, there is no indication nor averment by plaintiff that defendants will buy another "War Cloud" and display it in place of the seized horse.

However, if we broadly construe plaintiff's complaint, there can be read therein an alternative but more substantial allegation of copyright infringement. For plaintiff asserts that defendant's hobby horse "Thunder" infringes plaintiff's copyrighted horse "War Cloud" and this can be construed as averring that "Thunder", whether it be the horse seized by the Marshal, or the horse displayed in photographs furnished by defendant's counsel to the Court and to plaintiff, infringes on "War Cloud". It is admitted that the horse in the photographs was also on display in defendant's showrooms. Accordingly, we must now ascertain whether "Thunder" as portrayed in the picture is an infringing work.

Of necessity, the first item to be decided is the validity of plaintiff's copyright.

While defendant questions whether a hobby horse is entitled to copyright protection since all hobby horses flow from an effort to simulate real horses (Gurbst Affidavit, Mar. 29, 1965, at 12), it is no longer subject to dispute that statues or models of animals or dolls are entitled to copyright protection, see e. g., F. W. Woolworth Co. v. Contemporary Arts, Inc., 193 F.2d 162 (1st Cir. 1951) (model of a dog in a "show" position); Rushton Co. v. Vitale, 218 F.2d 434 (2d Cir. 1955) (chimpanzee); Ideal Toy Corp. v. Adanta Novelties Corp., 223 F.Supp. 866 (S.D.N.Y. 1963) ("Tammy" doll), and accordingly a model horse, *per se,* is copyrightable.

Plaintiff has annexed to his complaint the registration certificate covering "War Cloud". Section 209 of the Copyright Act (17 U.S.C. § 209 (1952)) provides that the registration certificate issued by the copyright office "shall be admitted in any court as prima facie evidence of the facts stated therein." This in effect means that a plaintiff, in a copyright infringement action based on a statutory copyright, is entitled to a prima facie presumption of originality since among the facts to be set forth in the certificate is a statement of the author of the work and "authorship presumptively connotes originality." Remick Music Corp. v. Interstate Hotel Co., 58 F.Supp. 523, 531 (D.Nebr.1944), aff'd, 157 F.2d 744 (8th Cir. 1946); see Drop Dead Co. v. S. C. Johnson & Son, Inc., 326 F.2d 87, 92 (9th Cir. 1963), cert. denied, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964).

Defendant does not directly attack the originality of "War Cloud." At a number of points in the affidavits submitted in opposition to the motion, defendant does infer that perhaps "War Cloud" is based on one of its (defendant's) prior hobby horse models, "Flash". Thus, for example, in ·the Affidavit of Herbert Gurbst, Vice President of defendant corporation (dated March 25, 1965), he

avers: "During the years 1963 to 1964 plaintiff has copied exactly from defendant and sold a number of lines of hobby horses. Plaintiff *may very well have* based its 'War Cloud' model, subject of this motion, on copies of defendant's models." Id. at 12. (Emphasis added.)

At the hearing, defendant produced prior models of its hobby horse line and compared them with other models of plaintiff's line, attempting to show that plaintiff had on prior occasions copied its models from defendant's. However, no specific attempt was made demonstrating how by reason of the copying of these other models, plaintiff had copied "War Cloud" as well. A similar veiled inference appears at page 13 of the same Gurbst Affidavit wherein he asserts that "[u]nder these circumstances [one of defendant's former employees having been hired by plaintiff] it is not surprising that plaintiff's 'War Cloud' has the characteristic appearance of defendant's 'Flash'.[1] (See Affidavit of Milton Henry, at page 3. "It is also immediately evident on visual inspection that plaintiff modeled its 'War Cloud' after defendant's 'Flash'.")

Is this a sufficient attack on the originality of "War Cloud"? I think not.

"[W]ith respect to the issue of plaintiff's originality upon introduction of the certificate of registration * * * the burden shifts to the defendant to prove that plaintiff copied from a prior source and hence was not original. Mere denial by the defendant, unsupported by evidence, is not sufficient to overcome the prima facie presumption of plaintiff's originality." Nimmer, supra, at § 139.2 at 602. And "[p]roof that plaintiff copied from prior works should involve the same elements as are required to establish copying by the defendant, i. e., access and similarity." Id. at 602, n. 235.

The fact that plaintiff took a matter admittedly in the public domain, (i. e., a horse) does not in and of itself

---

1. I might observe parenthentically that "War Cloud" has the characteristics of a real live horse, as well.

preclude a finding of originality, since plaintiff may have added unique features to the horse, enlarged it and made it sufficiently dissimilar from defendant's horse as to render it copyrightable to plaintiff. See Doran v. Sunset House Distrib. Corp., 197 F.Supp. 940, 941 (S.D. Calif.1961), aff'd, 304 F.2d 251 (9th Cir. 1962) (Santa Claus); Alva Studios, Inc. v. Winninger, 177 F.Supp. 265 (S.D. N.Y.1959) (Replica of Rodin's "Hand of God" in a reduced size); and cases cited supra at 421.

In addition, the thrust of defendant's affidavits, while seemingly discussing originality, are directed more to the matter asserted in its counterclaim (i. e., that one of defendant's former employees transmitted trade secrets to plaintiff, which presumably assisted it in the production of "War Cloud" and that, accordingly, a trust should be impressed on plaintiff's copyright), rather than to an attack on the originality *per se* of "War Cloud" insofar as it relates to the question of copyright. Accordingly, the affidavits will be so construed on the instant motion.

■ Thus in view of the failure of proof by the defendant, and in view of the disposition of the within motion, for the purposes of the present proceeding the Court will assume the originality of "War Cloud" and that plaintiff's copyright is valid and subsisting.

■ While copyright validity has thus been assumed, copyright infringement cannot also be assumed. Plaintiff must show copying to sustain his burden of proof. Direct evidence of copying is rarely available, since the cases are few wherein there is direct testimony by a witness that he saw defendant copying plaintiff's item. "Therefore copying is ordinarily established indirectly by the plaintiff's proof of access and substantial similarity." Nimmer, supra, § 141.2 at 613.

On the issue of access, it is admitted by defendant that it bought "War Cloud"

and displayed it. However, there is no proof as to when "War Cloud" was bought and, more importantly, as to what stage of development "Thunder" was in when "War Cloud" was bought by defendant, allegedly to demonstrate merely how a hobby horse would look in defendant's unique frame, since the model of "Thunder" on display next to "War Cloud" was too heavy to be mounted in the frame.

■ On the other hand, plaintiff avers that it first published "War Cloud" on March 17, 1964, a full year prior to its display by defendant, and from this fact it may be presumed that, at any point in that year, defendant had an opportunity to view plaintiff's item. There is a conflict of authority as to the burden plaintiff must carry to show access. Some courts have defined access as the actual viewing and knowledge of work by the person who composed defendant's work. See Nimmer, supra, at § 142.1 n. 35, and cases cited therein. These cases reason that the opportunity to view creates an inference of access which in turn creates an inference of copying. Professor Nimmer, however, in his treatise, submits that the proper test to be applied, and the more just test in terms of plaintiff's burden of proof, is to regard a "reasonable opportunity to view as access in itself and not merely as creating an inference of access." Id. at 615 (see id. at n. 39.) In view of the latter more liberal test, I am of the opinion that access has prima facie been shown. Accordingly, we now proceed to the more substantial aspect of plaintiff's case, upon which it has not sustained its burden, namely, proof of substantial similarity. See, generally, Nimmer, supra § 143, and its subdivisions.

Defendant asserts, and it is uncontradicted, that it has not produced a hobby horse named "Thunder". The only thing that has been produced, as of this point, is a plaster model of "Thunder" weighing approximately one hundred pounds which, due to its size and weight, has not been produced in court.[2]

**2.** In view of that fact and of the other sharply disputed facts presented by the respective affidavits as to what transpired when counsel appeared before Judge

It has, however, produced photographs of the plaster model. "War Cloud" was produced in court and the Court has in its possession photographs of "War Cloud" annexed to the writ of seizure.

In approaching the question of substantial similarity it must be borne in mind that the figure is a horse and that, accordingly, since both items are copies of horses, some similarity is inevitable. See Ideal Toy Corp. v. Adanta Novelties Corp., 223 F.Supp. 866, 868 (S.D.N.Y. 1963).

It is a well established rule of law that a copyright on a work of art does not protect a subject (i. e., a horse) but only the treatment of a subject. See, e. g., Stephens v. Howells Sales Co., 16 F.2d 805, 808 (S.D.N.Y.1926). This proposition was elaborated by Justice Holmes in Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 249–250, 23 S.Ct. 298, 47 L.Ed. 460 (1903) wherein with respect to cromolithographs of a circus scene prepared for advertising purposes, he said:

"But even if they had been drawn from the life, that fact would not deprive them of protection. The opposite proposition would mean that a portrait by Velasquez or Whistler was common property because others might try their hand on the same face. Others are free to copy the original. They are not free to copy the copy. Blunt v. Patten; 2 Paine 397, 400. Fed.Cas.No.1,580. See Kelly v. Morris, L.R. 1 Eq. 697; Morris v. Wright, L.R. 5 Ch. 279. The copy is the personal reaction of an individual upon nature. Personality always contains something unique. It expresses its singularity even in handwriting, and a very modest grade of art has in it something irreducible, which is one man's alone. That something he may copyright * * *."

By reason of the fact that defendant has not as yet made any infringing items,

save the plaster model, and the inability to produce it in court, I must weigh the question of similarity based on the photographs submitted. While Mr. Chapman, Treasurer of plaintiff corporation, in his affidavit in support of the motion (dated March 15, 1965) lists ten features common to both "War Cloud" and what he thought was "Thunder", it seems clear that he in fact was comparing "War Cloud" to the seized "War Cloud", for in his deposition, a part of which is set forth in defendant's brief at page 5, he states that he did not examine the plaster model of "Thunder" on display in defendant's showroom. In opposition, defendant sets forth some sixteen differences which it contends are substantial between "Thunder" and "War Cloud".

The closest case that I have been able to find raising a somewhat similar problem is F. W. Woolworth Co. v. Contemporary Arts, Inc., 193 F.2d 162 (1st Cir. 1951), wherein the copyrighted item was a model of a cocker spaniel in a "show" position.

In that case, the Court took particular note of the proportion, form, contour, configuration and conformation of the model rather than the coloring and standard stylized position of a dog in that particular stance as being matters of importance insofar as the distinctness of the copyrighted item was concerned.

On the issue of infringement, the Court stated as follows:

"There is ample evidence in the record that the plaintiff's dog and the Woolworth one embody the identical intellectual or artistic conception of a dog of the breed involved in show attitude. Moreover, this evidence is strongly supported by visual comparison. It is true that a dog with short hair on the head, neck and upper two thirds of the body is represented in the plaintiff's statuettes, whereas the dog in the Woolworth model is represented as having long hair on the

Cannella, and what was said at the time the subpoena to produce the model in court was served, plaintiff's motion to cite defendant for contempt in failing to so produce the model cannot be decided

on this disputed record. See Stringfellow v. Haines, 309 F.2d 910 (2d Cir. 1962); 4 Barron & Holtzoff § 2428 at 387–88 (1951).

body and neck. This difference, however, is unimportant, for on ample evidence the court below found that the representation of long hair on the Woolworth model could readily have been accomplished, and was in fact accomplished, by etching in wavy lines on a plaster master model made from one of the plaintiff's plaster statuettes. What is highly, if not conclusively, significant of copying is the fact that the plaintiff's and the defendant's statuettes are identical in proportion, and so far as we can see with inexpert eyes in conformation, and furthermore the configuration of the curls and folds of the long hair represented on the under body and the feathering represented on the legs of the plaintiff's statuette are shown as asymmetrical, and the defendant's statuette shows the identical lack of symmetry in these respects. Thus there is ample evidence that one model was copied from the other." Id. at 165–166.

In addition, in that case there was expert testimony on the issue of conformation.

In contrast, in the case at bar, plaintiff has relied on affidavits rather than live proof. There has been no expert testimony. The comparison of the animals of necessity must be done on the basis of photographs. Plaintiff's affidavits highlighting the similarity between the hobby horses in fact set forth the similarity between two models of the same horse.

██ Does the Court have enough before it upon which to invoke the extraordinary remedy of a preliminary injunction? Bearing in mind the subject matter involved[3] and the fact that in this area the line dividing originality, similarity and copying is thin at best, I think not. See Ideal Toy Corp. v. Adanta Novelties Corp., 223 F.Supp. 866, 868 (S.D. N.Y.1963); cf., Ideal Toy Corp. v. Sayco Doll Corp., 302 F.2d 623, 625 (2d Cir. 1962) (Dissenting opinion per Clark, J.).

██ "The granting of a preliminary injunction 'is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.' * * * 'It is a cardinal principle of equity jurisprudence that a preliminary injunction shall not issue in a doubtful case. Unless the court be convinced with reasonable certainty that the complainant must succeed at final hearing the writ should be denied.'" Nadya, Inc. v. Majestic Metal Specialities, Inc., 127 F. Supp. 467 (S.D.N.Y.1954).

██ Since I do not have sufficient information before me upon which to make the requisite findings, I am constrained to hold that plaintiff has not sustained its burden of proof and, accordingly, the motion for a preliminary injunction is denied.

I next proceed to plaintiff's claim of unfair competition.

Accepting the factual averments in the affidavits of plaintiff as true (as will be noted, infra, they are very hotly disputed), the following picture emerges.

Plaintiff asserts that defendant bought one of plaintiff's horses, painted it over thereby erasing plaintiff's copyright notice, changed the trademark thereon to defendant's trademark and thereafter displayed the horse in its showrooms and solicited orders on it, representing that the horses to be delivered were the same as the model displayed.[4] (Affidavit of Patrick J. Flaherty, Mar. 29, 1965.)

3. As was observed by Chief Judge Ryan in Alva Studios, Inc. v. Winninger, 177 F.Supp. 265, 267 (S.D.N.Y.1959): "Where the principal elements of design of plaintiff's copyrighted work and of defendant's allegedly infringing article are taken, as a common source, from an object in the public domain, mere resemblance will not justify a finding of infringement."

4. In its complaint, drawn on the theory that the seized "War Cloud" was really "Thunder", plaintiff averred that this seized model was being palmed off as plaintiff's, deceiving the public "into believing that the plagiarizing work is the copyrighted work." Complaint ¶ 8. This theory has, of course, now been changed in the light of subsequently developed facts.

While the propriety of these actions, if proven, may be subject to question, they do not constitute unfair competition, and even assuming, *arguendo*, that such a cause of action were made out, the facts are so in dispute that the grant of a preliminary injunction under these circumstances would be an improper exercise of this Court's equity powers.

It appears that what is involved herein is a "reverse" palming-off situation. In the usual case a defendant presents its product in such a way as to give the impression that it is plaintiff's product, thus palming off its product as that of another. Midwest Plastics Corp. v. Protective Closures Co., 285 F.2d 747 (10th Cir. 1960). In the case at bar, defendant has reversed the sequence and palmed off plaintiff's product as its own. Is this an actionable wrong?

It has now been definitively held by the Court of Appeals for this Circuit that state law (in this case New York law) governs an unfair competition claim resting upon the doctrine of pendent jurisdiction alone, as well as a claim resting both on pendent jurisdiction and diversity of citizenship. Flexitized, Inc. v. National Flexitized Corp., 335 F.2d 774, 780–781 (2d Cir. 1964).

In Pic Design Corp. v. Sterling Precision Corp., 231 F.Supp. 106 (S.D.N.Y. 1964), defendant bought certain items from plaintiff through an intermediary, removed their identifying markings, replacing them with its own, and resold the items to the customer.[5] Id. at 113.

Chief Judge Ryan initially limited International News Service v. Associated Press, 248 U.S. 215, 235, 39 S.Ct. 68, 63 L.Ed. 211 (1918) to its particular facts, thereby following that line of authority which has been less than enthusiastic with the broad sweep of that decision.[6]

"It is to be noted, however, that the International News Service case has not been given the scope and effect such language [at page 235 of 248 U.S., 39 S.Ct. 68 and quoted at page 113 of Judge Ryan's decision] would seem to demand. Subsequent cases exhibit a lack of judicial enthusiasm for a full extension of this doctrine; e. g., Speedry Products Inc. v. Dri Mark Products, Inc., 2 Cir., 271 F.2d 646 (1959)." 231 F.Supp. at 113; see Handler, Product Simulation: A Right or a Wrong, 64 Colum.L.Rev. 1183 (1964).

Then, in reliance on Mastro Plastics Corp. v. Emenee Indus., Inc., 16 A.D.2d 420, 228 N.Y.S.2d 514, 517 (1st Dep't), aff'd without opinion, 12 N.Y.2d 826, 236 N.Y.S.2d 347, 187 N.E.2d 360 (1962), Chief Judge Ryan held that "[w]e are unable to find any actionable wrong at common law under the facts of this case insofar as defendants' actions in purchasing items from plaintiff for resale are concerned." 231 F.Supp. at 114. [The Court then proceeded to discuss, on the facts presented, a possible violation of the Lanham Act, 15 U.S.C. § 1125(a) (1963).]

In the *Mastro Plastics* case, supra, the New York courts denied any common law right of action in a case where a defendant bought bongo drums from plaintiff, removed plaintiff's trademarks and identifying characteristics, replaced them with its own and used them as a sample to the trade of its own brand of bongos. As is obvious, the facts are almost indistinguishable from those in the

---

5. In the case at bar, however, defendant is only accused of using plaintiff's item as a display and sample and taking orders on it. There is no allegation that defendant is buying plaintiff's horses en masse and selling them to customers.

6. The *International News Service* case held actionable the defendant's issuing of plaintiff's news compilations as its own, thus applying the common law doctrine of unfair competition "to misappropriation as well as misrepresentation, to the selling of another's goods as one's own—to misappropriation of what equitably belongs to a competitor." Schechter Poultry Corp. v. United States, 295 U.S. 495, 532, 55 S.Ct. 837, 844, 79 L.Ed. 1570 (1935).

case at bar. The Court, in denying relief, held as follows:

"Title to these chattels which plaintiff had put on unrestricted general sale and for which defendant paid plaintiff's price had passed to defendant. By reason of such title defendant has as much right to sell and use them for the purposes of sale as it would an exact reproduction of the plaintiff's drums made by itself. A workable distinction between a right to use in the channels of trade an original to which title had been acquired and an exact reproduction is not easily drawn.

In removing the plaintiff's trademark from the chattels to which defendant had acquired title, defendant did precisely what it should have done to avoid unfair competition before using them as samples in trade, because, although its right to resell or use for the purposes of trade the drums made by plaintiff is clear, it had no such right to use the plaintiff's trade-mark in furtherance of its own trade or promotion (cf. Lanvin Parfums Inc. v. Le Dans, Ltd., 9 N.Y.2d 516, 215 N.Y.S.2d 257, 174 N.E.2d 920; Bourjois Sales Corp. v. Dorfman, 273 N.Y. 167, 7 N.E. 2d 30, 110 A.L.R. 1411).

Placing its own trade-mark on the drums is quite a different thing from misusing the plaintiff's trade-mark. If defendant has the right to reproduce and sell reproductions of plaintiff's drums it had a correlative right to put its trade-mark on the chattel it proffered to the public; and, indeed, the reverse situation exists from that which would have occurred if the defendant had left plaintiff's trade-mark on the drums.

The use of its own trade-mark amounted to a representation that defendant and not the plaintiff stood behind the sample chattel and behind the chattels bought in reliance on the sample. This is the antithesis of palming off and the plaintiff demonstrates no actionable rights in the defendant's use of its own trade-mark on a product it bought to use in promoting its own products." Id. 228 N.Y.S.2d at 517.

On appeal, the Court of Appeals affirmed the lower court's decision but granted plaintiff leave to serve an amended complaint based on 15 U.S.C. § 1125(a) (1963) for a preliminary injunction.

While these decisions are persuasive, I would prefer to rest my denial of the motion not on the absence of a cause of action for unfair competition, but rather on an insufficiency of proof. In the *Mastro* case, for example, the Court's opinion was based in part on the fact that plaintiff had not secured a patent or copyright on the drums, and accordingly "[w]hat it [defendant] could thus reproduce [without fear of copyright or patent infringement] and sell it could use as samples of what it would produce and sell." 228 N.Y.S.2d at 516. Similarly, in the *Pic* case, supra, there was no discussion as to whether the items bought were covered by a patent.

In addition, in Midwest Plastics Corp v. Protective Closures Co., 285 F.2d 747 (10th Cir. 1960), cited above, one of the averments was that the defendants had bought quantities of the plaintiff's products and resold them to its customers. Id. at 749. And while the thrust of the opinion revolves around the normal palming-off situation, at least one of the cited cases involved reversed palming off, and the Court cited the following language in its opinion: " 'Deceit is the basis of an action of this character. The principle underlying unfair trade practice cases is that one manufacturer or vendor is palming off his merchandise as that of another * * * or that he is vending the products of another as his own * * *.' Reynolds & Reynolds v. Norick, 10 Cir., 114 F.2d 278, 281." Id. at 750. See Pic Design Corp. v. Sterling Precision Corp., supra, 231 F.Supp. at 113.

Moreover, while International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) has been limited, there is language therein particularly applicable to the instant case. 248

U.S. at 241–42, 39 S.Ct. 68. The scope of the wrong was similarly expressed in the opinion of Mr. Justice Holmes, who disagreed not as to the impropriety of the action nor as to the necessity of some relief, but rather as to the scope of the relief granted. 248 U.S. at 247, 39 S.Ct. 68. See also A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 531–532, 55 S.Ct. 837, 79 L.Ed. 1570 (1935).

Accordingly, a review of the sharp conflict as to the facts is warranted.

Plaintiff's position, as set forth above, is that defendant's sales representative, one Irving Sircus, quoted prices on the seized "War Cloud" and was accepting orders on it. (See Affidavit of Patrick J. Flaherty, Mar. 29, 1965; Affidavit of Thomas E. Chapman, Mar. 29, 1965.)

In opposition, defendant submits the affidavit of Herbert Gurbst, its Vice President, wherein he asserts that "Defendant's plaster model of its 'Thunder' horse so displayed weighs approximately 100 pounds, much too heavy to be placed in the metal frames in which hobby horses usually weighing 10 to 15 pounds are displayed, sold and used by children. Such a weight might cause the frame to collapse. In any event, it would make it impossible to demonstrate the movement of defendant's hobby horse and its position in relation to the frame. * * * Defendant did not yet have a polyethylene sample of its 'Thunder' model for display but wished to be able to demonstrate the size and position of a polyethylene horse, the size of its 'Thunder' model and its position in defendant's unique frame." (Gurbst Affidavit, March 29, 1965, at 3–4.) Accordingly, the plaintiff's model "War Cloud" was purchased and painted over and was placed adjacent to the plaster model of "Thunder".

Gurbst further avers as follows:

"I was present during the Toy Fair and engaged in selling on behalf of defendant. I also conducted sales meetings and instructed defendant's sales personnel and was present during much of their selling. Prospective customers were shown defendant's plaster model and told that this was the hobby horse which defendant would manufacture and sell. The only reference made to the plaintiff's hobby horse modified and set in defendant's frame as aforesaid was to indicate to prospective customers the mode and manner in which defendant's horse would appear in the frame. * * *

* * * Plaintiff's horse modified by defendant for demonstration purposes was not offered for sale by defendant." Id. at 4–5.

Similarly, Irving Sircus, the individual who is accused of having taken the orders on "War Cloud" initially, asserted in his affidavit that he did not know Flaherty, to whom the representations were allegedly made, and did not meet him on the day alleged, and in support submits his appointment sheet for that date. He further averred that

"[i]n accordance with the instructions of defendant's Vice President, Herbert S. Gurbst, at a sales meeting, the Saturday prior to March 3, 1965, in attempting to sell defendant's 'Thunder' model hobby horse, I demonstrated defendant's plaster model exhibited in defendant's showroom. I told the customers that this was the hobby horse which defendant would produce and sell.

The only reference I made to plaintiff's hobby horse 'War Cloud', exhibited nearby defendant's plaster model, in defendant's unique frame, was to say that defendant's horse would fit and ride in defendant's frame substantially in the same manner. At no time did I state that defendant was selling plaintiff's 'War Cloud' or that defendant's model was a 'knock-off' of plaintiff's 'War Cloud', as alleged by Mr. Flaherty. I did not say to anyone, in reference to plaintiff's horse, 'This is our new model—isn't it a beauty,' as asserted by Mr. Flaherty. Nor did I ever state to him or anyone else that plaintiff's horse was 'our new model' or 'our new horse.'

At all times, I made clear to the customers, and to all who questioned me,

that the horse to be manufactured and sold by defendant was in its 'Thunder', to be modeled after the plaster model exhibited in the showroom." (Sircus Affidavit, April 9, 1965, 2–3.)

There is similar conflict as to whether the plaster model of "Thunder" was displayed adjacent to or even in the same area as "War Cloud". (Compare Chapman Affidavit, March 30, 1965, at 2, with Gurbst Affidavit, March 29, 1965, at 5.)

■ Based on the sharp conflict of facts in the affidavits, it is impossible to even attempt to ascertain whether, assuming that certain actions, if proved, would constitute actionable unfair competition, the horse was put to such an improper use. In view of this sharp conflict, I am unable to permit the invocation of the equity powers of this Court and permit the imposition of such a drastic remedy on such a minimal showing.

■ "Where sharp issues of fact are presented it is apparent that the case is not a fit one for preliminary relief and the resolution of the disputed issues must await trial. [Citing cases.]" Heyman v. Ar. Winarick, Inc., 166 F.Supp. 880, 883 (S.D.N.Y.1958); see General Elec. Co. v. American Wholesale Co., 235 F.2d 606, 608–609 (7th Cir. 1956).

Finally, plaintiff, in its supplemental memorandum of law, for the first time asserts a cause of action based on an alleged violation of Section 1125(a) of Title 15 of the United States Code (the Lanham Act) (15 U.S.C. § 1125(a) (1963)). In its complaint, plaintiff neither alleges that defendant violated this section nor even sets forth factual averments from which such violation can be inferred, though not specifically pleaded. Moreover, the "newly acquired facts" upon which plaintiff bases this assertion were known to it as of March 29, 1965, and no motion was made or attempted, though there surely was sufficient time to do so, to amend the complaint to add a cause of action for a violation of Section 1125(a). On that basis alone I

would be disposed to deny its motion for a preliminary injunction predicated on a violation of that section.

■ However, even assuming *arguendo* that the complaint had been amended and the matters set forth in the supplemental memorandum of law incorporated therein, there would still be both an insufficiency of pleading and proof to warrant the issuance of a preliminary injunction.

Section 1125(a) of Title 15 of the United States Code in pertinent part provides:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods * * * a false designation of origin * * * including words or other symbols tending falsely to describe or represent the same, and *shall cause such goods or services to enter into commerce,* and any person who shall with knowledge of the falsity of such designation of origin * * * cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person * * * who believes that he is or is likely to be damaged by the use of any such false description or representation." (Emphasis added.)

As is obvious from the language italicized in the above citation, the only actionable wrong proscribed by the statute is the false designation of origin of a product and the causing of its subsequent entry into interstate commerce.

The word "origin" has now been definitively held to refer not merely to geographical origin, but in addition, to origin of source or manufacture as well. Federal-Mogul-Bower Bearings, Inc. v. Azoff, 313 F.2d 405, 408 (6th Cir. 1963).

■ However, the requirement of the statute that the goods upon which the false designation appears must enter into interstate commerce is not to be lightly taken since it is jurisdictional in nature. Miles Lab., Inc. v. Frolich, 195 F.Supp. 256, 257–258 (S.D.Cal.), aff'd,

296 F.2d 740 (9th Cir. 1961) (Per curiam), cert. denied, 369 U.S. 865, 82 S.Ct. 1030, 8 L.Ed.2d 84 (1962). See Mogul-Bower Bearings, Inc. v. Azoff, supra. Even causing one item with false designation to enter into commerce is sufficient. Drop Dead Co. v. S. C. Johnson & Son, Inc., 326 F.2d 87, 93 (9th Cir. 1963), cert. denied, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964). But for pleading purposes there must at least be that minimal connection and, a fortiori, there must be some proof of such connection on a motion for a preliminary injunction.

The term "used in commerce" is defined in the statute as follows:

For the purposes of this chapter a mark shall be deemed to be used in commerce (a) on goods when it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto and the goods are sold or transported in commerce and (b) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in this and a foreign country and the person rendering the services is engaged in commerce in connection therewith.

In the case at bar the only allegation is that defendant replaced plaintiff's trademark with defendant's in violation of Section 1125(a) and that the horse was on display in defendant's showroom in New York. However, there is no averment herein that the seized "War Cloud" with the false designation entered into interstate commerce subsequent to the time that the trademark was changed. It is obvious that, having been seized, the article cannot now enter into interstate commerce. In short, even accepting all of plaintiff's assertions as true, there is no statement either express or implied that the seized "War Cloud" at *any time* was caused to enter into interstate commerce.

"There is no allegation that after the making of any misrepresentation in regard to the goods any of the defendants caused such goods to enter into commerce or transported or used them in commerce, even though an allegation of such subsequent connection of the goods with commerce is an essential element of the cause of action created by the Act. It is true that 'commerce' as used in the Act is defined broadly as 'all commerce which may lawfully be regulated by Congress.' 15 U.S.C.A. § 1127. This definition, though broad, is not all-inclusive. Business essentially local in nature is still outside the scope of its terms in the absence of some relationship to interstate commerce sufficient to bring it within the limits of Congressional power. The complaint does not allege such a relationship nor any facts nor circumstances from which such a relationship can be inferred."

Samson Crane Co. v. Union Nat'l Sales, Inc., 87 F.Supp. 218, 221 (D.Mass.1949), aff'd, 180 F.2d 896 (1st Cir. 1950) (Per curiam).

While, in the case at bar, the defendant company obviously deals in interstate commerce, it is the transportation of the item with the mark on it rather than the general scope of business which would appear to be determinative under the statute, and, as noted, the item itself has never entered into interstate commerce and was never transported therein.

Moreover, even if we were to construe the statute as applying to goods which, though not themselves individually having false designations, were sold and entered into commerce as a result of the intrastate display of the seized "War Cloud" with the false designation and therefore "affecting commerce", (see Drop Dead Co. v. S. C. Johnson & Son, Inc., 326 F.2d 87, 94 (9th Cir. 1963), cert. denied, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964); Stauffer v. Exely, 184 F.2d 962, 966 (9th Cir. 1950); Mastro Plastics Corp. v. Emenee Indus, Inc., 14 N.Y.2d 498, 248 N.Y.S.2d 223,

197 N.E.2d 620 (1964); see also Alumi-num Fabricating Co. of Pittsburgh v. Season-All Window Corp., 160 F.Supp. 41, 45–46 (S.D.N.Y.1957), aff'd, 259 F.2d 314 (2d Cir. 1958)) [7], an injunction could not issue thereon in view of the sharp conflict as to the use made of the horse. The same considerations necessitating the denial of an injunction on a claim of unfair competition apply here as well. (See 428, supra.)

To be distinguished from the instant case is Pic Design Corp. v. Sterling Precision Corp., 231 F.Supp. 106 (S.D.N.Y. 1964), relied upon so heavily by plaintiff, wherein there was proof, at a trial on the merits, that there had been an order by a customer and a receipt by him of one of plaintiff's items, shipped by defendant after the removal of all designation. In that case there was no question of sale, use in commerce, and/or a use "affecting commerce", whereas in the case at bar, aside from the unsupported and contradicted assertions of plaintiff, there is a total failure of proof on this critical point.

In summation, I find myself unable to issue an injunction on: (a) a claimed copyright infringement, by reason of an inability to determine the issue of similarity, i. e., insufficiency of proof; (b) unfair competition by reason of the sharply conflicting and contradictory factual averments in the affidavits of the respective parties; and (c) violation of the Lanham Act, by reason of an insufficiency of pleading and proof and the same conflict as to the facts noted in subdivision (b) above.

Accordingly, on the basis of the facts before me or the lack thereof, the motion for a preliminary injunction is denied.

In addition to its motions for a preliminary injunction, plaintiff also moves herein to dismiss defendant's amended conterclaim.

Rule 15(a) of the Federal Rules of Civil Procedure provides in part that "[a] party may amend his pleading once as a matter of course at any time before a responsive pleading is served * * *."

In the case at bar the summons and complaint for copyright infringement and unfair competition were served on March 8, 1965, and the answer and counterclaim were served by defendant's original counsel on March 12, 1965. Plaintiff moved to dismiss this counterclaim by a motion served on March 16, 1965.

Thereafter, different counsel were substituted by defendant, and the deposition of plaintiff's Treasurer was commenced. On March 26, 1965, an amended answer and counterclaim for unfair competition was served, within twenty days of the service of the summons and complaint.

██ Defendant was entitled to serve under the Rules an amended pleading as a matter of right prior to service by plaintiff of a responsive pleading, and no such responsive pleading has been filed. Plaintiff's motion to dismiss the counterclaim was not such a responsive pleading and thus did not terminate plaintiff's right to amend under Rule 15(a). Breier v. Northern California Bowling Proprietors' Ass'n, 316 F.2d 787, 789 (9th Cir. 1963) and cases cited therein.

Accordingly, I will now proceed to the merits of plaintiff's motion to dismiss, addressed to the amended counterclaim.

██ On a motion to dismiss, the averments of the pleading attacked must,

---

**7.** While *Mastro*, supra, presents a closely analogous problem, in that case there seemed to have been no dispute that sales were made and goods shipped in commerce as a result of the display of the item with false designation, whereas in the case at bar there is no such showing. In addition, as distinguished from *Mastro*, in the instant case there is no allegation that defendant's products were inferior in quality to plaintiff's, (see

George O'Day Associates, Inc. v. Talman Corp., 206 F.Supp. 297, 300 (D.R.I.), aff'd sub nom. O'Day Corp. v. Talman Corp., 310 F.2d 623 (1st Cir. 1962), cert. denied, 372 U.S. 977, 83 S.Ct. 1112, 10 L. Ed.2d 142 (1963)), an allegation which has been said to be the very essence of a Section 1125(a) Lanham Act violation. Note, Development in the Law, Competitive Torts, 77 Harv.L.Rev. 888, 907–08 (1964).

of course, be accepted as true. 2 Moore, Federal Practice ¶ 12.08 (2d ed. 1964).

The thrust of defendant's counterclaim is to impress a trust on plaintiff's copyright by reason of the appropriation from defendant of valuable trade secrets which enabled plaintiff to produce the copyrighted "War Cloud".

"The hobby horse body copyrighted by plaintiff was created as a result of plaintiff's misappropriation of defendant's trade secrets in conspiracy with defendant's former employee, Kovacs, who, while in defendant's employ, participated in the creation of the design of the hobby horse copyrighted by plaintiff and reproduced those designs for plaintiff and revealed other of defendant's designs and trade secrets." (Defendant's Memorandum of Law at 9.) Defendant thus asserts that one of its employees, to whom were revealed many secret processes respecting the method, mode and sources of materials for molds and sculpting services, was induced by plaintiff to terminate his services with defendant, and to betray these secrets relating to design of hobby horses to plaintiff. These secrets included the "process of rotational casting embodying the use of powdered polyethylene [alleged to be] * * * unique in the manufacture of hobby horse bodies and [which] represented confidential information and a trade secret * * *." (Amended Answer ¶ Ninth.) Similarly, in the second amended counterclaim, defendant alleges that by reason of the confidential nature of his (Kovacs') employment, defendant's President showed to him certain porcelain statues of horses, the features of which were to be embodied into the design of a hobby horse body, and that this information was also given to plaintiff by Kovacs and subsequently embodied in "War Cloud". By reason of all these acts, defendant seeks to impress a trust on plaintiff's copyrighted horse.

Insofar as the remedy is concerned, if plaintiff has a cause of action the imposition of a trust is one of the remedies which might be imposed. Colgate-Palmolive Co. v. Carter Prod., 230 F.2d 855, 865 (4th Cir.), cert. denied, 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956).

Plaintiff, in its brief in opposition, admits the propriety of the claim insofar as it arises out of the same transaction or series of transactions as plaintiff's claim, thus being a proper counterclaim. (Plaintiff's Brief in support of motion to dismiss at page 7.) However, based on two recent Supreme Court decisions, Sears Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), plaintiff asserts that defendant has not set out a claim upon which relief can be granted.

Plaintiff argues that "due to the failure of defendant to allege that defendant's alleged copied designs were patented or copyrighted (as they in fact are not) under Sears Roebuck and Co. v. Stiffel Co. * * * and Compco Corp. v. Day-Brite Lighting, Inc. * * * plaintiff would have had a perfect right to copy such alleged designs * * *." (Plaintiff's Brief, supra, at page 3.)

The holdings of both cases is best summed up as follows:

"Today we have held in Sears, Roebuck & Co. v. Stiffel Co., (supra) that when an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article. To forbid copying would interfere with the federal policy, found in Art. I, § 8, cl. 8, of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain. Here Day-Brite's fixture has been held not to be entitled to a design or mechanical patent. Under the federal patent laws it is, therefore, in the public domain and can be copied in every detail by whoever pleases."

Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. at 237–238, 84 S.Ct. at 782.

What effect do these cases have on the trade secret doctrine?

In the very recent case of Titelock Carpet Strip Co. v. Klasner, 142 U.S.P.Q

405 (Cal.Super.Ct. July 24, 1964), the defendant not only copied plaintiff's machine in "practically all details" (ibid.) but was a former employee who had gained access to the premises under the guise of seeking to purchase parts of plaintiff's machine as scrap, when in fact he intended to use these parts for purposes of reconstruction "and physically appropriate[d] from the plaintiff's plant some of the parts which went into the assembling of the defendant's first machine." (Ibid.) Although acknowledging that "many hundreds of hours of effort" went into plaintiff's project before he had produced an economically effective machine and that the defendant had obtained "for free" the advantage of all of this experimental effort, cost and time expenditure, the plaintiff was left without relief aside from a $250. recovery, the cost of the misappropriated scrap parts. Citing *Sears* and *Compco*, supra, the Court held defendant's conduct "if a wrong" to be actionable only under the patent laws. Cf., Angell Elevator Lock Co. v. Manning, 348 Mass. 623, (Mass. Sup.Jud.Ct., March 2, 1965.)

In Servo Corp. of America v. General Elec. Co., 337 F.2d 716 (4th Cir. 1964), cert. denied, 383 U.S. 934 (1965), plaintiff corporation in its complaint sought recovery for infringement of three patents and for unjust enrichment. The Court of Appeals, on appeal, held the two patents involved in the appeal invalid, but nonetheless sustained a cause of action for unjust enrichment, based on improper appropriation of trade secrets by defendant.

It appears from the opinion that plaintiff corporation had a confidential relationship with the Southern Railway Company during plaintiff's installation and testing of its "hot box detector" on Southern's tracks in Salisbury, North Carolina.

In breach of this confidental relationship, one of Southern's officers accompanied defendant's engineers to Salisbury where members of the party photographed the installation, brought back with them Southern's drawings of the installation, and examined a diagram of the installation made by plaintiff; and the court below confirmed the master's finding that defendant, as a result of the trip, " 'gleaned and copied ideas belonging to Servo * * *.' " Id. at 722.

The Court of Appeals initially stated the traditional pre-*Sears* rule, that "where a holder of a trade secret imparts to another in confidence and that other person then appropriates it for his own use, equitable remedies may be invoked to remedy the wrong. That it is not necessary that the trade secret be covered by patent was made explicit by the early and oft-quoted case of Booth v. Stutz Motor Car Co. of America, 56 F.2d 902 (7 Cir. 1932)." Id. at 723.

The Court then distinguished *Sears* thusly:

"Because of the confidential relationship which was betrayed here by Southern, this case is distinguishable from Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L. Ed.2d 661 (1964). In that case the action was grounded upon state law which gave a remedy for copying resulting in confusion as to the source of manufacture. In that case the Court held that a manufacturer whose design and mechanical patents are invalid for want of invention cannot under state unfair competition law obtain an injunction against copying its product, nor an award of damages for such copying, as such use of state law conflicts with the federal government's power to grant patents. The Court went on to hold that an unpatented article being in the public domain may be freely copied as the federal patent law had preempted the field from state action. This case, however, is one of unjust enrichment through breach of a confidential relationship, and the remedy is derived from the court's power to award general equitable relief. In Saco-Lowell Shops v. Reynolds, supra, [4 Cir.,] 141 F.2d [587] at page 598, we held:

'[W]hether the [inventor's ideas] were covered by patent or not, he

was entitled to protection against their use by one to whom he had disclosed them in the course of a confidential relationship.' "

Id. at 724–725.

After quoting the Restatement of Torts § 757(c) (1939) to reject the defendant's argument that the secrets were obtained not from plaintiff but from Southern, the Court held that "General Electric and Southern were *in pari delicto* and General Electric may not escape liability in a court of equity." Id. at 725.

The Court then stated:

"Several cases have held that a businessman who hires his rival's former employee and induces the employee to divulge the rival's trade secrets imparted in confidence may be required to respond in damages. A. O. Smith Corp. v. Petroleum Iron Works Co. of Ohio, 73 F.2d 531 (6 Cir. 1934). modified on another point, 74 F.2d 934 (6 Cir. 1935); Herold v. Herold China and pottery Co., 257 F. 911 (6 Cir. 1919). The facts here vary; the principle remains constant. General Electric learned that which it needed to know through Southern, and both parties knew that their concerted activities were in violation of the confidence reposed in Southern by Servo. Under the circumstances the plaintiff is entitled to recover of the defendant the reasonable value of the data acquired and utilized by it in unfair competition with the plaintiff. See International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918)." Ibid.

■ It is axiomatic that a pleading should not be dismissed if by any construction it states a claim upon which relief can be granted. See 2 Moore, Federal Practice ¶ 12.08 (2d ed. 1964).

■ In view of the *Servo* decision, I am of the opinion that the amended counterclaim as drawn does state a claim upon which relief could be granted.

In addition, in view of the state of flux in which this area of the law is presently embroiled in light of the *Sears* and *Compco* decisions [8] I would be loath to dismiss a pleading until the exact guidelines of those decisions are definitively set.

In view of that fact, plaintiff's motion to dismiss the counterclaim is denied.

The motions are disposed of as noted herein.

So ordered.

### APPENDIX "A"

■ "The Copyright Act grants to the copyright proprietor the exclusive right to reprint, publish, copy and vend the copyrighted work (17 U.S.C. § 1), but it gives him no further right of control over the use or disposition of the individual copies of the work once he has sold or otherwise disposed of them." Burke & Van Heusen, Inc. v. Arrow Drug, Inc., 233 F.Supp. 881, 882 (E.D. Pa.1964) and cases cited therein at page 882 et seq.; see 17 U.S.C. § 27 (1952).

■ "The use of a copyrighted work is not an infringing act if such use does not fall within the scope of those rights expressly granted to the copyright proprietor." Nimmer, Copyright § 100 at 374 (1963). Of course, "the nature of rights available to a copyright owner will often vary considerably depending upon the type of work which has been copyrighted." Nimmer, supra, § 100 at 375. In the case at bar, Section 1(a) of Title 17 delineates the rights reserved to the plaintiff, which include the right to "print, reprint, publish, copy and vend the copyrighted work."

There clearly is no infringement herein by defendant on the right to print or reprint the copyrighted work. (See, generally, Nimmer, supra, § 102.) The only

---

8. See, e. g., Symposium-Product Simulation: A Right or Wrong, 64 Colum.L.Rev. 1178 (1964) which includes articles by Daphine R. Leeds (id. at 1179), Milton Handler (id. at 1183), Walter J. Derenberg (id. at 1192), Ralph S. Brown (id. at 1216); Note, Unfair Competition Protection After Sears & Compco, 40 N.Y. U.L.Rev. 101, 108 nn. 66, 67 (1965).

possible rights infringed upon are those of copying, vending and/or publishing.

█ The statute included the right to vend and publish as a protected right, as a complement to the preservation of the right to copy, since "it would be anomalous indeed if the copyright owner could prohibit public distribution of his work when this occurred through unauthorized copying but were powerless to prevent the same result if the owner's own copies (or copies authorized by him) were stolen or otherwise wrongfully obtained and thereafter sold or published." Nimmer, supra, § 103.31 at 384–85.

█ However, "[t]his rationale becomes inapplicable in the situation where the copyright owner first consents to the sale or other disposition of his work. * * * [A]t this point the policy favoring a copyright monopoly for authors gives way to the policy opposing restraints of trade and restraints on alienation." Nimmer, supra, § 103.31 at 385. See Burke & Van Heusen, Inc. v. Arrow Drug, Inc., supra. The same rationale, policy considerations and rule of law apply to the right to publish as well. Nimmer, supra, § 104 at 390.

█ Accordingly, once the item has been lawfully obtained, as in the case at bar, the "first sale" doctrine (see, generally, Nimmer, supra, § 103 and its subdivisions) would apply and the proprietor thereafter loses his right to control its subsequent vending and/or publication.

█ As is obvious, however, the rule should not apply with respect to other rights protected by the statute. Nimmer, supra, § 103.34.

Since, in the instant case, it is not disputed that the hobby horse was lawfully acquired, the above-cited precedents would appear to apply and hence any subsequent vending (the existence of which is a very sharply disputed fact) or publication infringes on none of plaintiff's presently-protected rights.

Similarly, insofar as the right to copy is concerned, there is no "tangible object that is a reproduction of the original work," (Nimmer, supra, § 101.2 at 376); in fact there has been no reproduction whatsoever. Compare Mura v. Columbia Broadcasting System, Inc. et al., 245 F.Supp. 587 (S.D.N.Y.), which involved the display of copyrighted puppets on television as constituting infringement of copyright. However, in that case the plaintiff alleged that the defendants made copies of her hand puppets by reproducing a transitory picture on a television screen.

Accordingly, there has been no infringement of any rights reserved to plaintiff as a result of the display by defendant of a lawfully-acquired model of plaintiff's hobby horse. See also Scarves By Vera, Inc. v. American Handbags, Inc., 188 F.Supp. 255 (S.D.N.Y. 1960), wherein the defendants purchased plaintiff's copyrighted towels and incorporated them into their ladies' handbags. Significantly in that case, suit was not brought on the theory of copyright infringement but rather a violation of Section 105 of Title 17.