Fred G. Moritt, J.
This is a holdover summary proceeding to obtain possession of an apartment now occupied by the tenant. The essential basic facts were agreed to by the parties, namely, that the apartment is in a building containing more than six dwelling units; that the tenant originally went into possession pursuant to a written lease dated November 21,1959, which lease was for a term of one year from December 1,1959, to November 30, 1960; that since the expiration of said lease the .tenant remained in possession with the permission of the landlord; that the rent stipulated in the lease was paid by the tenant; that the apartment is not under control of the New York City Rent and Rehabilitation Administration, an order of decontrol having been issued on June 16, 1958; and that a notice purporting to terminate the tenancy as of August 31, 1969, was duly served upon the tenant.
The landlord’s basic contention was that the apartment in question is not now subject to control pursuant to Local Law No. 16 (Local Laws, 1969, No. 16 of City of New York) referred to as the (New) Rent Stabilization Law of the City of New York since Local Law No. 16 is unconstitutional.
This court held the so-called Rent Stabilization (Local) Law repugnant to both the Constitution of the State of New York and the Constitution of the United States on December 17,1969, and promised to give its reasons.
At the outset, the court wishes to emphasize that what is not involved herein is the constitutionality of the old rent control laws pertaining to residential apartments in buildings that were constructed prior to February 1, 1947, etc.
The court heretofore granted a motion made by the law firm of Royall, Koegel and Wells, attorneys for Citizens for Better Housing, to appear amicus curiae. The court wishes to thank the said law firm for the oral arguments made by its Richard N. Winfield on December 17,1969, and for the brief which the court received on January 7, 1970. Not only is the court grateful for their appearance, but has taken the liberty to make use of some of their brief.
*108 The “ Rent Stabilization Law of 1969 ” (hereinafter “ RSL ”), was passed by the New York City Council on April 24, 1969, was approved by the Mayor on May 6, 1969, and became effective May 12, 1969. This local 1 ‘ law ’ ’ amending the Administrative Code of the City of New York provides for a novel and unprecedented form of housing regulation. On its face, it authorizes “ voluntary self-regulation ” of the “ housing industry ” by an association of real property owners under the supervision of the New York City Housing and Development Administration (hereinafter “ HDA ”).
Section 6.0 of the RSL provides for the organization of a real estate industry association having as members the owners of at least 40% of the dwelling units covered by the new laws. Such an association is required to adopt a code, in conformity with the terms and conditions of the RSL, for the regulation of rent increases and other landlord-tenant matters. In order to be recognized, such an association must register with HDA. However, HDA may not accept any association for registration unless the association has enacted a ‘1 code ’ ’ which has been approved by HDA.
Title Y of chapter 51 of the Administrative Code of the City óf New York (City Rent and Rehabilitation Law) is the New York City local law providing for standard rent control in the vast majority of residential dwelling units constructed before February 1,1947. Section 4.0 of the RSL provides that dwelling units covered by the RSL will be deemed subject to standard rent control under the provisions of title Y unless the owner of such dwelling units becomes a member in good standing of an association registered with HDA.
The Legislature may, in the exercise of its police power, impinge to some extent upon normal constitutional rights and privileges during a temporary emergency in order to safeguard the public health and safety. Once such emergency conditions have terminated, the emergency regulations must also cease immediately.
The alleged emergency condition in housing accommodations in units constructed before February 1, 1947, has apparently persisted to the present day and therefore requires the continued application of the very stringent provisions of title Y of the Administrative Code. Presumably, if emergency conditions existed with respect to housing accommodations constructed after 1947, requiring regulations as strict as those required for pre-1947 construction, the City Council would not have hesitated in directly mandating that such regulations apply to all housing *109 accommodations whenever constructed. The City Council did not do this.
If the sovereign State (via the Senate, Assembly and Governor) did not directly mandate that post-1947 construction be regulated in the same manner as pre-1947 construction, can the local power structure (City Council and Mayor) be permitted, to achieve this purpose indirectly under the guise of authorizing allegedly ‘ ‘ voluntary ’ ’ self-regulation by a minority 40% of the owners of the dwelling units? Gan a local legislature implicity therefore threaten to impose such regulations upon the other 60% unless they waive their constitutional rights by submitting to regulation by a private association with a high-sounding name having no governmental authority of any kind? I think not.
It is elementary that administrative officials, who have been given no direct authority by the Legislature to accomplish a .specific goal, cannot attempt to obtain such results indirectly. (See, e.g., Matter of Nationwide Life Ins. Co. v. Superintendent of Ins., 16 N Y 2d 237.)
Decisions by other courts of original jurisdiction have avoided the constitutional question. The courts which have sustained its validity have avoided the constitutional issue by holding that an owner of real property need not comply with the terms and conditions of the RSL unless he elects to do so of his own free will. This argument is based on the judicial contention that an individual owner of real property may “refuse” to join an association authorized by section 6.0 of the RSL. For example, in 8200 Realty Corp. v. Lindsay (60 Misc 2d 248, 259-261), Mr. Justice Gellinoff stated that (p. 260): “ The short answer to these contentions is that it is not the city, nor the State enabling act, nor Title YY which obligates the landlord to return moneys to tenants; it is the landlord’s own association, which he has voluntarily joined, which compels him to do so. If he chooses not to join he does not have to agree to make the refund.”
With all due deference to my learned colleague, any interpretation of the RSL to the effect that real property owners are offered a realistic choice must ignore the economic condition and the political climate of New York City today. Under section 4.0 of the RSL, refusal by a real property owner to join the association will subject all housing accommodations owned by him to the more onerous provisions of the City Rent and Rehabilitation Law (Administrative Code, ch. 51, tit. Y), the rent control statute regulating buildings constructed before February 1,1947.
*110 The alleged “ choice ’’offered to owners of real property is referred to as though such choice involved two alternatives offering approximately the same advantages and disadvantages. This is completely inaccurate. No one in the industry or in government truly considers a landlord’s submission to regulation under the more onerous provisions of title Y — the pre-1947 regulation — as a “ choice ” which any landlord would “ voluntarily ” make. In fact, what the. City Council did by means of section 4.0 of the RSL was to ensure that every landlord would immediately submit to the scheme of self-regulation under penalty of more stringent regulation. This is the key to the unconstitutionality of the RSL.
Furthermore, the claim that the association is a “ voluntary ” form of self-regulation is absurd. The individual members of the association have no meaningful voice in the formulation and adoption of the associations’s code, but rather, the terms and conditions of the code are dictated to the association by HDA. The truth of this assertion is demonstrated by the arbitrary manner in which HDA prescribed the terms of the original code proposed by the Rent Stabilization Association.
The Rent Stabilization Association was formed shortly after the adoption of the RSL. In June, 1969, the association submitted a proposed code to HDA for its approval so that the association could qualify for registration with HDA. The association received no comments concerning the code from HDA until three days before the deadline for approval of the code. By letter dated July 9, 1969, HDA rejected the proposed code and directed the association to resubmit the code no later than Saturday, July 12, 1969, containing various amendments and additions dictated by HDA. If the association failed to comply with this mandate, HDA threatened to impose standard rent control upon all housing accommodations subject to the RSL pursuant to section 4.0 of the RSL. Acting under protest, the association complied. There was, of course, no opportunity for a full and free discussion by the members of the association of the demands of HDA prior to compliance. The associations’s officers believed that such dictated terms were preferable to subjecting an entire industry to standard rent control.
In the light of HDA’s conduct, it is difficult to understand how the association can be deemed a voluntary form of self-regulation. The very existence of the association and its qualification under the RSL depend completely upon the whim of HDA. The members of the association and the property owned by them are governed by the terms of the code, and neither' the members nor *111 the officers of the association have any real discretion or latitude in adopting the terms and conditions of that code.
Thus the RSL is an unconstitutional exercise in arbitrary power. The local administrative power structure has attempted to impose regulations on the housing industry under the guise of ‘ ‘ voluntary ’ ’ self-regulation. However, such compliance cannot be considered ‘ ‘ voluntary ’ ’, nor can the activities of the private association be considered “ self-regulation ”. The Municipal Council and the Mayor have arbitrarily required that the owner of real property waive his rights to due process and freedom of association under the threat of imposing standard rent control.
It is elementary that municipal legislative bodies may only pass ordinances, changes in the Administrative Code, but not laws. They may have the effect of laws, but laws can be enacted only by the sovereignty, that is enactment by the People of the State of New York represented in the Senate and Assembly and approved by the Governor.
The delegation by the State Legislature to cities under home rule laws does not give any city (large or small) even though desireable legal authority to enact any and all ordinances it may deem good and necessary for the good and welfare of their city.
If municipalities had such authority, it would not be necessary for cities (lately six of them) to have representatives (lobbyists) in Albany, nor have high city officials make their annual trek to Albany (hat in hand) to plead with their sovereign Legislature to enact laws beneficial for that city.
In the case at bar there is no provision in any law of this land that this court, or anyone else for that matter, has been able to find which authorizes a city, a State or a nation to delegate to a private agency the right to make its own rules and regulations having the force of law, especially to “ stabilize ” rent (whatever that means) in the manner it was done herein and that it be administered via the opinions, whims, arguments, dreams and or nightmares of their lawyers as reflected in their transient daily, weekly or monthly “ by-laws ”.
The State enabling act which transferred rent control from the State to the city contained a finding that rent control may be administered locally, but this enactment by no stretch of judicial construction can be interpreted to mean that the municipality can further delegate to a private agency the power to write repugnant. City Hall lyrics to old time-honored established melodies, vis: our Federal and State Constitutions.
The court is here concerned only with the legal aspects of the (new) Rent Stabilization Law urged by the Mayor and the New *112 York City Council in further abridgement of the free right of contract between landlord and tenant. No one ¡should endeavor to gather the personal views of this court as to the necessity for rent control from this opinion. I am not now involved in the making of laws, but interpreting the laws, and especially to live up to my sworn duty to uphold the Constitutions of the United States and the State of New York.
Mr. Chief Justice Charles Evans Hughes in the prevailing opinion and Mr. Justice Benjamin N. Cardozo in a concurring opinion in the N. R A. case, Schechter Corp. v. United States (295 U. S. 495) made some very pertinent remarks which are landmarks. Mr. Chief Justice Hughes stated (p. 528): ‘ ‘ Undoubtedly the conditions to which power is addressed are always to be considered when the exercise of power is challenged. Extraordinary conditions may call for extraordinary remedies. But the argument necessarily stops short of an attempt to justify action which lies outside the sphere, of constitutional authority. Extraordinary conditions do not create or enlarge constitutional power.” (Emphasis supplied).
And at page 555 Mr. Justice Cardozo stated: [“Wages and hours of labor] are essential features of the plan, its very bone and sinew. There is no opportunity in such circumstances for •the .severance of the infected parts in the hope of saving the remainder. A code collapses with bone and sinew gone.”
The very essence of the local legislation under attack is the provision for regulation by a private body sanctioned by no law or authority I am able to find. The “ bone and sinew ” of the “ Rent-Stabilization ” enactment now under attack being self-regulation, must be struck down as unconstitutional. Ergo, there is nothing left of the enactment which can survive.
The RSL was conceived in the midst of a political campaign when a multitude of candidates were seeking the favor of the higher income bracket tenants. The results of the voting should not and does not have any effect on the unconstitutionality of the law. The Constitution of the United States and of the State of New York, and the safeguards therein, are .too precious to be swept aside by executives, wise or otherwise, seeking the favors of a polarized majority and minority.
That the legislation was hastily conceived to curry favor with the voters (there are more .tenants who vote than landlords) is illustrated by several remarks made by the Mayor during the campaign, “ I forced the landlords to force back unfair rents.” (CBS T. V., Friday, October 21, 1969, about 9:02 a.m., et seq.) “ The Rent Stabilization Board was created by me.” (Sunday, November 2, 1969,11:20 p.m. CBS T. V.) All this may be good *113 self-serving campaign oratory, but bad constitutional law. Apparently, the relationship in 1969 between the Mayor and members of the New York City Council (who were also rather involved in their own re-elections) can best be described by referring to an immortal scene in ‘ ‘ The Mikado ’ ’. Explaining why he claimed credit for an execution, when he had done nothing of the kind, Ko-Ko tells ,the Mikado: ‘ ‘ When your Majesty says, ‘ Let a thing be done, it’s as good as done— practically, is done — because your Majesty’s will is law.’” And if it is done, “ why not say so? ”
The following thumb-nail summary is illustrative of the crude “ do it or else ” threat implicit in the “ Rent-Stabilization ” purpose. Messrs. Landlords of New York City’s uncontrolled and decontrolled housing units on Park Avenue, South of 96th Street. You are directed to voluntarily form and join a private landlord’s club. Of course, you do not really have to do so. But, then, if you do not, you will be ‘ ‘ de-decontroiled ” and rolled back to the same legal category as the controlled ones on Park Avenue North, etc.
Result: The concerned landlords not only are deprived of their property without due process of law by virtually being robbed of lawful income, not by violence, but by being put in fear of subjection to ,the mercy, whims, caprices and/or judgment of the local bureaucrats of the rent commission, a fate worse than that accorded to slumlords, who merely pay their paltry fines in the Criminal Court and then continue their scummy, scavenger business as usual in the slums.
When rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them. Unless there can be found a rational basis for the legislation in the Constitution, it must be declared unconstitutional. Legislation is not constitutional simply because a majority of the people may favor it, or because it may be expedient politically during an election year.
Mr. Justice Hugo L. Black of the United States Supreme Court in Turner v. United States (396 U. S. 398, 426) wrote in language pertinent to the case at bar: ‘ ‘ Our Constitution was not written in the sands to be washed away by each wave of hew judges blown in by each successive political wind which brings new political administrations into temporary power. Rather, our Constitution was fashioned to perpetuate liberty and justice by marking clear, explicit and lasting constitutional boundaries for trials.”
*114 Unless there is specific sanction in our Constitution the city has no power or right to impinge upon the right of a free people to freely contract. Unless that right to curtail the power and right of the people to freely contract is explicitly curtailed by the Constitution, the assumption of that power must be struck down as unconstitutional no matter how efficacious we may think the legislation may be. If there is no power in the present state of the Constitution for the city to have enacted the local ordinance, it must be struck down. The local legislation is, and must be declared therefore to be, unconstitutional.
There is a simple constitutional method by which the city could regulate rents of buildings erected after February 1, 1947. Any nonpartisan, knowledgeable lawyer could write it easily. The amorphous “ Bent Stabilization Law ” is patently unconstitutional.